# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-628

JAMES RUBIN, ET AL.

VERSUS

STATE OF LOUISIANA, ET AL.

**\*\*\*\*\*\*\*\*\*\***

## APPEAL FROM THE
## FIFTEENTH JUDICIAL DISTRICT COURT
## PARISH OF LAFAYETTE, DOCKET NO. 2012-4314
## HONORABLE MICHELLE M. BREAUX, PRESIDING
**\*\*\*\*\*\*\*\*\*\***

## SYLVIA R. COOKS
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Jimmie C. Peters and Marc T. Amy, Judges.

**REVERSED AND REMANDED.**

**David C. Laborde**
**Andrew B. Mims**
**Laborde Earles Law Firm, LLC**
**203 Energy Parkway, Bldg. B**
**P.O. Box 80098**
**Lafayette, LA 70598-0098**
**(337) 261-2617**
**ATTORNEY FOR PLAINTIFFS/APPELLANTS**
   **James Rubin and Velma Rubin**

**James D. "Buddy" Caldwell, Attorney General**
**Jeannie C. Prudhomme, Assistant Attorney General**
**556 Jefferson Street, 4th Floor**
**Lafayette, LA 70501**
**(337) 262-1700**
**ATTORNEY FOR DEFENDANTS/APPELLEES**
   **State of Louisiana, et al.**

**COOKS, Judge.**

In this appeal, Plaintiffs contend the trial court improperly granted Defendants' motion for summary judgment. Finding there were genuine issues of material fact that should have precluded the granting of summary judgment, we reverse and remand.

## FACTS AND PROCEDURAL HISTORY

This action arises out of the tragic death of Ms. Sadairea Rubin. Plaintiffs, James and Velma Rubin, the surviving parents of Ms. Rubin, filed suit in district court asserting the actions and inactions of the University Medical Center-Lafayette (hereafter UMC) led to the premature release of Douglas Johnson, a mentally ill man, who subsequently killed Ms. Rubin after being released from UMC's care.

The facts established Mr. Johnson began dating Ms. Rubin in 2005 and the two of them eventually began living together. At the time of the brutal beating of Ms. Rubin at the hands of Mr. Johnson, they had lived together for over five years. According to Mr. Johnson, he first started experiencing symptoms of mental illness in 2008. Mr. Johnson testified he would hear voices and "wasn't in his right mind." He eventually quit his job as a barber, because he was concerned about being around people due to the symptoms he was experiencing.

He began working in the oilfields, but was laid off approximately six months before Ms. Rubin's death. During this time, Mr. Johnson's symptoms became significantly worse, and a few weeks before Ms. Rubin's death, he beat his dog to death with a baseball bat inside his apartment. Mr. Johnson told police he killed his dog because God told him the dog was the devil. Mr. Johnson testified his mental problems only intensified following this incident. On the night of August 22, 2011, neighbors told police Mr. Johnson was in his driveway during a rainstorm screaming out to God.

On the morning of August 23, 2011, Corporal Shannon Brasseaux and Officer Tyler Howerton, of the Lafayette Police Department, responded to a complaint of a door being kicked down at an apartment complex on North Meyers Street. Upon arrival, Cpl. Brasseaux noticed a man, later identified as Mr, Johnson, jogging up and down the road near the apartment complex. Cpl. Brasseaux approached Mr. Johnson, who he described as sweating profusely and appearing disoriented.

Cpl. Brasseaux discovered Mr. Johnson lived in the apartment complex with his girlfriend, Ms. Rubin. Upon further questioning, Cpl. Brasseaux stated Mr. Johnson told him he had found a dead body in one of his neighbor's apartments before and that he heard footsteps upstairs. Mr. Johnson stated he knew the woman who lived there, Ms. Sherry, had left, but he didn't see her son leave and thought "maybe he was dead." This led Mr. Johnson to kick down the door and go inside. Not finding any body inside, Mr. Johnson then explained to Cpl. Brasseaux that he then attempted to search another person's car for a dead body in the trunk, but was refused. Mr. Johnson also told Cpl. Brasseaux that he believed the maintenance men at the complex were throwing away body parts in the dumpster. Mr. Johnson also told Cpl. Brasseaux that he believed he was the Messiah, that God talks to him and tells him to do things.

Obviously concerned over Mr. Johnson's rambling and talking of dead bodies, as well his admitted kicking in of his neighbor's door, Cpl. Brasseaux made the decision to handcuff Mr. Johnson and place him in the back of the squad car. Cpl. Brasseaux then went inside the complex and examined the apartment unit where Mr. Johnson had kicked down the door. He noted the door was kicked down with such force "the door frame was actually kicked off." After determining no one was inside the apartment, Cpl. Brasseaux interviewed the tenants and maintenance men who had gathered outside. Cpl. Brasseaux was informed of Mr.

Johnson's recent bizarre behavior, including the instance the previous night where he was observed on his knees during a rainstorm screaming to God in the driveway.

Upon completion of his on-site investigation, Cpl. Brasseaux decided to transport Mr. Johnson to UMC for a psychological evaluation. Cpl. Brasseaux stated he chose to do this, because he "didn't want to leave him there in the state of being that he was in and not get him some type of help." Cpl. Brasseaux testified he does not always bring every patient with mental issues to the hospital, but believed Mr. Johnson required such a step, stating: "Well, his hallucinations, the hallucinations that he was having. He was there alone. And if we didn't get him any type of medical or mental evaluation, it could have progressively gone into something worse, which apparently it did." Cpl. Brasseaux then called his supervisor, explained the situation, and it was agreed Mr. Johnson would be brought to UMC for an evaluation.

Mr. Johnson arrived at UMC at approximately 11:15 a.m. in Cpl. Brasseaux's squad car. Cpl. Brasseaux spoke with triage nurse Gina Speyrer and related what he knew about Mr. Johnson to her. Cpl. Brasseaux also walked into the emergency room and spoke with Dr. Seyed Alireza Sadeghi, the supervisor at that time of the UMC emergency room. Cpl. Brasseaux testified as to his conversation with Dr. Sadeghi:

> Yes, I spoke to Dr. Ali [Sadeghi], informed him what I had. And I told him exactly what had – you know, what had happened. A lot of times when you bring an individual to UMC, if you don't go personally speak to the doctor, they'll kind of just – you know, kind of sweep it out or not particularly know as much information as they would have if they didn't speak to the officer. So I make it a point to go and speak to him. And he said, "We'll go ahead and evaluate him." He said, "He sounds like a good candidate." I said, "Okay."

Nurse Speyrer testified she recalled talking to Cpl. Brasseaux. She also recalled spending about five minutes with Mr. Johnson. She completed a nurse

triage form which reflected that Mr. Johnson denied any symptoms of mental illness. On the line on the triage form for indicating whether the patient was exhibiting abnormal attitude, mood or thought process, Nurse Speyrer placed a question mark. She did not check off the box that stated the patient was oriented to the situation. There was nothing on the triage form referencing the information provided to her by Cpl. Brasseaux regarding the strange behavior and comments of Mr. Johnson.

Mr. Johnson was next brought into the emergency room and placed in the psychiatric "safe room" at UMC. It was UMC policy to place psychiatric patients in the safe room until it was determined what treatment was appropriate. At this point, Jade Doucet, a nurse at UMC, was assigned to Mr. Johnson. In her deposition, Nurse Doucet stated she could not recall her conversations with any of the doctors, nurses or Mr. Johnson, and could only rely upon the notes she made on Mr. Johnson's chart. Nurse Doucet noted the medical records showed blood and urine panels were ordered, but only the blood was drawn. She stated it was her belief that both blood and urine testing was important to properly evaluate a psychiatric patient.

The emergency room physician that evaluated Mr. Johnson was Dr. Derrick Darnell Brooks. Dr. Brooks, a board certified internist and pediatrician, is not a psychiatrist or psychologist. He stated he did not remember speaking with Dr. Sadeghi regarding Mr. Johnson. It was indicated on Mr. Johnson's chart that his chief complaint was hallucinating and the severity level was listed as severe. Dr. Brooks also noted under the "NEURO/PSYCH" section of the chart that Mr. Johnson spoke about religion often. Dr. Brooks ordered Mr. Johnson to be examined by Michael Milliken.

Mr. Milliken is licensed in Louisiana as a Professional Counselor, although Defendants refer to him as a mental health social worker. He spent approximately

10-20 minutes with Mr. Johnson going over a "checklist" he had prepared. He noted Mr. Johnson spoke of praying and stated he believed in God. Mr. Milliken determined that Mr. Johnson did not meet the criteria for involuntary commitment, and informed Dr. Brooks of that determination. Mr. Milliken testified he was not informed by anyone of Mr. Johnson's bizarre behavior as related by Cpl. Brasseaux.

Immediately after conferring with Mr. Milliken, Dr. Brooks made the decision to discharge Mr. Johnson. He determined Mr. Johnson was not a danger to himself nor to others because he did not have suicidal or homicidal thoughts. Dr. Brooks then called Ms. Rubin to come pick up Mr. Johnson. Dr. Brooks stated Ms. Rubin expressed no concerns to him over picking up Mr. Johnson. However, Plaintiffs contend Ms. Rubin was concerned over Mr. Johnson being a possible danger. Mr. Johnson was officially discharged from UMC at 1:05 p.m., approximately 90 minutes after his arrival.

After his discharge, Mr. Johnson was dropped off at his apartment by Ms. Rubin, who then left. Several hours later, Mr. Johnson decided he wanted to go to Baton Rouge to attend services at Jimmy Swaggart's church, which he had seen on the television. He then called a cab to take him to Baton Rouge. During the trip, after speaking to Ms. Rubin, he changed his mind about going to Baton Rouge. He asked the cab driver to turn around at Henderson, Louisiana. After being dropped off at a gas station back in Lafayette, Ms. Rubin brought him back to his apartment. Shortly after arriving back at his apartment, Mr. Johnson attacked Ms. Rubin and beat her to death with the same baseball bat he had earlier used to kill his dog. After killing Ms. Rubin, Mr. Johnson called the police, who arrested him. He was later found not guilty by reason of insanity. He is currently housed at a mental facility in Louisiana.

As part of the criminal prosecution against Mr. Johnson, a Sanity Commission was ordered by the trial court to determine Mr. Johnson's mental capacity at the time of the murder, as well as his competency to stand trial. Three mental health professionals interviewed Mr. Johnson and reviewed the pertinent documents as part of their reports.

In assessing the reasons for the attack on Ms. Rubin, David Dawes, M.D., stated, "[i]t appears as though [Mr. Johnson] wrongly believed that he was being attacked or put in a 'tiger grip' by his girlfriend and thought that she had killed Jesus, feeling compelled to kill her." Dr. Dawes believed Mr. Johnson's behavior shortly before the incident was "consistent with someone experiencing paranoid delusions of a religious nature." Relevant to this appeal, Dr. Dawes stated:

> In reviewing the notes from his evaluation at the UMC Emergency room from earlier in the day of 8-23-11 after he had kicked in the door of his landlord's apartment there is documentation of his being religiously preoccupied but he was denying hallucinations or suicidal or homicidal thoughts at the moment. His admitting diagnosis listed at UMC was "mentally unstable."

Sanity Commission member Larry Benoit, Ph.D., concluded as follows concerning Mr. Johnson's condition at the time of his treatment at UMC:

> There is significant evidence of delusional thinking and command hallucinations prior to and during the time period in which the offense is alleged to have been committed. A number of witnesses describe frequent to continuous bizarre behavior predominating during the weeks prior to the commission of the alleged offense. During the week prior to his arrest, the defendant demonstrated moderate to severely impaired social relationships.

Lastly, Lyle LeCorgne, Ph.D., evaluated Mr. Johnson on two occasions and concluded in his written report the following as to Mr. Johnson's mental condition in the time period before, during and after the attack on Ms. Rubin:

> Neighbor accounts of Mr. Johnson's mood and behavior for approximately two months prior to the murder reflect an insidious deterioration of his overall functioning from how he was previously perceived. He was portrayed as being absorbed by religiosity. Approximately one week prior to the murder, Mr. Johnson was described as having been kneeling outside during a heavy rain holding

a Bible, "screaming and praying." The cab driver's recollection of the content of Mr. Johnson's interaction with him also clearly reflected a religious preoccupation.

. . . .

Since his arrest and incarceration, Mr. Johnson has been maintained on olanzapine, 5 mg, an antipsychotic medication, which appears to have ameliorated and stabilized his condition. There were no indications of unusual thinking or psychotic residuals during the present assessment. However, this examiner notes that Mr. Johnson's de facto confession in his interview with the police is carried out with emotional detachment, evidence of delusions of religiosity, and the loss of contact with the boundaries of objective reality. He appears to have been unable to accurately perceive events, causing him to form mistaken impressions of people and what their actions signify. His inability to separate reality from fixed false beliefs, i.e., religious delusions, resulted in thought processes that were both illogical and incoherent. The flow of his ideas reflected fragmented and disorganized thinking, and he was unable to come to reasonable conclusions about the relationships between events such that his ideas were connected in a comprehensible manner. It is reasonable to conclude that Mr. Johnson was actively psychotic at the time of his alleged offense and believed that he was being directed to carry out the act he committed due to the presence of religious delusions. Similarly, it is highly unlikely that he knew that what he was doing was wrong.

Plaintiffs filed a wrongful death and survival action. Named as Defendants were the State of Louisiana, through the Board of Supervisors of the Louisiana State University and Agricultural and Mechanical College, University Medical Center-Lafayette, and five medical personnel who were employed at UMC in August of 2011, Dr. Seyed Alireza Sadeghi, Nurse Gina Speyrer, Nurse Jade Doucet, Mr. Michael Milliken, and Dr. Derrick Darnell Brooks. Plaintiffs allege Defendants breached their duty in the treatment and discharge of Douglas Johnson on August 23, 2011, which directly resulted in the death of their daughter.

Defendants filed a Motion for Summary Judgment in the trial court alleging the following grounds:

1. Douglas Johnson did not meet the criteria for involuntary detention as provided in the Louisiana Mental Health Law, [La.R.S.] 28:53; consequently, neither Dr. Brooks nor UMC was negligent/liable for discharging Douglas Johnson from the UMC Emergency Department on August 23, 2011; and

2. Plaintiffs will not be able to prove that the State defendants were negligent under the duty-risk analysis.

A hearing on the motion for summary judgment was held on March 30, 2015. The trial court granted summary judgment in Defendants' favor, finding there was no breach of the standard of care required under La.R.S. 28:53. A judgment in accordance with that ruling was signed by the trial court on April 15, 2015, dismissing Plaintiffs' petition with prejudice. Plaintiffs have appealed that judgment, arguing the trial court erred in granting summary judgment.

## ANALYSIS

When reviewing a trial court's judgment on a motion for summary judgment, an appellate court employs the de novo standard of review "using the same criteria that govern the trial court's consideration of whether summary judgment is appropriate, i.e., whether there is a genuine issue of material fact and whether the mover is entitled to judgment as a matter of law." *Supreme Servs. & Specialty Co., Inc. v. Sonny Greer, Inc.*, 06-1827, p. 4 (La. 5/22/07), 958 So.2d 634, 638. The burden of proof is with the movant. La.Code Civ.P. art. 966(C)(2). The motion for summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, admitted for purposes of the motion for summary judgment, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B)(2). Thus, we must analyze the substantive law governing the instant matter to determine whether a material fact exists. *Jagneaux v. Lafayette City-Parish Consol. Gov't Parks & Recreation*, 13-768 (La.App. 3 Cir. 12/11/13), 128 So.3d 681.

The trial court granted summary judgment in Defendants' favor on the basis that it found there was no breach of the standard of care required under La.R.S. 28:53. Initially, we note La.R.S. 28:53 simply provides for the issuance of a

Physician's Emergency Certificate (PEC), which is required to detain a patient who does not voluntarily wish to be treated. It does not change the standard of care applicable to physicians in treating mentally ill patients. Defendants attempt to argue that the ordinary standard of care controlling the practice of physicians who treat mentally ill patients is somehow controlled by La.R.S. 28:53. That statute simply provides the necessary steps which must be taken by a physician in issuing a PEC. Those steps do not supersede or override the standard of care generally applicable to health care providers in determining whether a patient is dangerous to self, dangerous to others, gravely disabled, or in need of immediate medical detention and care.

Further, we note La.R.S. 28:53 does not provide immunity for physicians. The statute speaks only to immunity specifically in regard to the role of police officers, stating "[u]pon arrival at the treatment facility, the escorting peace officer shall then be relieved of any further responsibility and the person shall be immediately examined by a physician, preferably a psychiatrist, who shall determine if the person shall be voluntarily admitted, admitted by emergency certificate, or discharged." La.R.S. 28:53(L)(2). Thus, under La.R.S. 28:53, a police officer "may take a person into protective custody and transport him to a treatment facility for a medical evaluation when, as a result of his personal observation, the peace officer . . . has reasonable grounds to believe the person is a proper subject for involuntary admission to a treatment facility because the person is acting in a manner dangerous to himself or dangerous to others, is gravely disabled, and is in need of immediate hospitalization to protect such a person or others from physical harm." La.R.S. 28:53(L)(1). At this point, it then becomes a question of whether the standard of care applicable to physicians in treating mentally ill patients was breached following the delivery of Mr. Johnson to UMC by Cpl. Brasseaux.

Plaintiffs cite the case of *Bellard v. Willis Knighton Medical Center*, 34,360 (La.App. 2 Cir. 5/9/01), 786 So.2d 218, *writ denied*, 01-1686 (La. 9/21/01), 797 So.2d 676, as supporting the assertion that the intake staff and Dr. Saghedi had a duty to relay all pertinent information to Dr. Brooks and Mr. Milliken. In *Bellard*, it was contended an emergency room nurse breached the applicable standard of care in having security remove a paranoid and psychotic patient, instead of notifying the ER doctor and detaining the patient for treatment. Several hours after the patient was removed from the ER, he was killed in an armed confrontation with police. Plaintiffs in *Bellard* argued it was not disputed that the applicable standard of care required the emergency room nurse to inform the doctor on duty of the patient's condition so that he could be detained if necessary on a PEC. They argued if this duty was not breached the patient would not have become involved in the confrontation with police. The court in *Bellard* agreed with plaintiffs' argument concerning the applicable standard of care, stating "[i]n this case, there is no dispute that the applicable standard of care required the emergency room nurse to notify the doctor of the patient's condition. It is also not disputed that this did not occur." *Id.* at 225. The court in *Bellard* ultimately found the jury did not manifestly err in finding there was no breach of the duty owed because it was concluded the nurse did not have sufficient time to speak to a doctor regarding the patient's condition, as he was only in the ER for approximately fifteen minutes. The *Bellard* court held "the jury chose one of two permissible views of the evidence presented and concluded that there was no breach of duty under the facts presented in [that] case." *Id.* There were two dissenting judges who opined the jury was clearly wrong in discounting the unanimous expert opinion that the standard of care was breached.

Defendants argue the facts in *Bellard* are distinguishable from the current case. They note Nurse Speyrer "not only obtained information from Mr. Johnson,

but made certain that Mr. Johnson was examined by a physician, Dr. Brooks." Interestingly, Defendants do not contend the information obtained by Nurse Speyrer from Cpl. Brasseaux, as to the documented instances of Mr. Johnson's bizarre and violent behavior, was provided to Dr. Brooks or Mr. Milliken. Nor is it contended that Dr. Saghedi spoke with Dr. Brooks. Thus, the factfinder could reasonably conclude the applicable standard of care which requires the emergency room nurse to notify the doctor of the patient's condition as noted in *Bellard* was not met here.

In this case, Dr. Brooks and Mr. Milliken worked in tandem to evaluate Mr. Johnson to determine if he was in need of continuing care. There is, at a minimum, a factual dispute as to whether Dr. Brooks and Mr. Milliken were adequately relayed information that was provided to the UMC intake staff and the ER supervisor, Dr. Saghedi, as to the bizarre and violent behavior recently exhibited by Mr. Johnson. Plaintiffs maintained Dr. Brooks and Mr. Milliken were not provided the necessary information to make an informed determination as to the necessity of a PEC. Cpl. Brasseaux testified he specifically walked into the ER to inform Dr. Saghedi of Mr. Johnson's violent and bizarre behavior. Dr. Brooks stated in his deposition he could not recall speaking with Dr. Saghedi or any officers regarding Mr. Johnson during his time at UMC.

Likewise, Mr. Milliken's notes do not reflect any information concerning Mr. Johnson's hallucinations, talk of dead bodies or Mr. Johnson's belief he was the Messiah. Mr. Milliken testified he did not remember anyone telling him Mr. Johnson had told Cpl. Brasseaux he was the Messiah. In his deposition testimony, Mr. Milliken indicated knowledge of Mr. Johnson's behavior and claims he was the Messiah would have been relevant in making an informed evaluation of Mr. Johnson:

A.    Well if someone is – is telling me that they're Jesus Christ or that they're, you know, something – someone is delusional or grandiose, its – well I would probe a lot more.  I would try to get some more information but that would be – that would be a red flag for me.  That would – those – I would – I would be a little worried about that person and I would tell the ER doctor that.  That would be up for them to decide if they wanted to keep them or not.  But I'd be like, this worries me a little bit if this person is telling me they're Jesus Christ or the President of the United States or they're something, you know, along those lines.

Q.    Why would that worry you?

A.    Because it – it just would sort of point – it would be some evidence that – that they may not have complete, you know, grasp of reality.  I mean, if they're telling me they're the President of the United States or something.  It's like, okay, that it's some – something is up with their thought process.  And so that's something I'm not comfortable dealing with so you would need to see a psychiatrist for that . . . I would be more comfortable having them see a psychiatrist because I just don't know.  I mean we could be totally wrong but I'd rather be on the safe side, you know to err on the safe side.

Mr. Milliken's testimony clearly indicates had he possessed all the information known by Nurse Speyrer and Dr. Saghedi, he may have reached a different conclusion concerning the need for a PEC to be issued in regard to Mr. Johnson.

Plaintiffs also presented the affidavit of F.T. Friedberg, Ph.D., a clinical psychologist, who reviewed all records in this matter.  Dr. Friedberg concluded that Mr. Johnson was suffering a major mental disorder (likely Paranoid Schizophrenia) at the time of his admission to UMC and at least three months prior.  Dr. Friedberg noted Mr. Johnson was found Not Guilty by Reason of Insanity in his criminal trial.  Dr. Friedberg concluded Mr. Johnson was dangerous to self, dangerous to others and gravely disabled on the date of his evaluation at UMC.  In his affidavit, Dr. Friedberg rendered the following opinion concerning the evaluation at UMC:

His evaluation at UMC was grossly flawed, initially by minimizing, or discounting the observations of the arresting officer.  All of the individuals in the chain of evaluation spent no more than a few minutes with the patient, never establishing the rapport necessary to find out what was going on with him emotionally.  Without this personal connection, little pertinent information can be gleaned,

especially in individuals suffering from paranoid or delusional ideation. None of the individuals in the evaluation are specifically trained in psychopatology, or the diagnosis and treatment of major mental disorders. . . . There does *appear to be a serious neglect of duty to perform the necessary and comprehensive evaluation that the presenting complaints noted by the arresting officer indicated.* (Emphasis added.)

The record is clear Nurse Speyrer made no notations on her triage chart regarding Mr. Johnson's comments about dead bodies, his hallucinations, and/or the bizarre behavior witnessed by neighbors that was related to her by Cpl. Brasseaux. The record also indicates Dr. Saghedi did not relay the concerns and information provided to him by Cpl. Brasseaux. There is a genuine dispute whether Nurse Speyrer and Dr. Saghedi fulfilled their duty to "notify the [treating] doctor of the patient's condition" as set forth in *Bellard*. Thus, the trial court's judgment that there was no breach of the standard of care required of physicians examining a mentally ill patient is not appropriate at the summary judgment stage of the proceedings.

## DECREE

For the foregoing reasons, our de novo review of the law and evidence reveals there are genuine issues of material fact present, and thus the motion for summary judgment should have been denied. Accordingly, the judgment of the trial court granting Defendants' motion for summary judgment is hereby reversed, and the case remanded to the trial court for further proceedings. All costs of this appeal are assessed to Defendants/Appellees.

**REVERSED AND REMANDED.**